UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

LISSETTE VELEZ, on behalf of herself
and her minor children, JOHN VELEZ
and STEVEN PAGAN,

                    Plaintiffs,

          - against -                          02 Civ. 8315 (JGK)

WILLIAM C. BELL, in his individual             <u>MEMORANDUM OPINION</u>
and official capacities; NICHOLAS                   <u>AND ORDER</u>
SCOPPETTA, in his individual and
official capacities; EVELYN ORTIZ,
in her official capacity; KATHIA
BROWN, in her official capacity;
and THE CITY OF NEW YORK,

                    Defendants.

_____

JOHN G. KOELTL, District Judge:

        This action, which alleged violations of the plaintiffs'

rights under the United States Constitution, was brought

pursuant to 42 U.S.C. § 1983 and was tried before a jury.  The

plaintiff Lissette Velez ("Ms. Velez") brought this action on

behalf of herself and her two minor children against the City of

New York and various current and former officers of the New York

City Administration for Children's Services ("ACS") alleging

violations of the plaintiffs' constitutional rights in

connection with the initial seizure and continued retention of

the children by ACS.  The prior history and allegations in the

case are detailed in this Court's prior opinion denying in

1

substantial part the motion for summary judgment by the defendants, familiarity with which is assumed.  See Velez v. Reynolds, 325 F. Supp. 2d 293 (S.D.N.Y. 2004).[1]

The plaintiffs moved, at the close of the presentation of their case, for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, and the defendants cross-moved for judgment as a matter of law under Rule 50 as well.  The Court reserved decision on the motions at that time, and no further evidence was presented.  After the defendants rested, the motions were renewed and the Court again reserved decision. Following a verdict in favor of the defendants on all claims, the plaintiffs additionally moved for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure on the ground that the verdict was against the weight of the evidence.  For the following reasons, the plaintiffs' motions are **denied** and the defendants' motion is **denied as moot**.


**I.**

It is well-established that a district court should deny a Rule 50 motion unless "viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the

---

[1] Prior to trial, the claims against Marilyn Reynolds and the Child Development Services Corporation were dismissed by stipulation.

weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Cruz v. Local Union Number 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)) (alteration in original); see also Fowler v. N.Y. Transit Auth., No. 96 Civ. 6796, 2001 WL 83228, at *1 (S.D.N.Y. Jan. 21, 2001); Dailey v. Société Générale, 915 F. Supp. 1315, 1321 (S.D.N.Y. 1996), aff'd in relevant part, 108 F.3d 451, 457-58 (2d Cir. 1997).

A trial court considering a motion under Rule 50(b) motion "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir. 1993). A jury verdict should be set aside only when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the movant]." Logan v. Bennington Coll. Corp., 72 F.3d 1017, 1022 (2d Cir. 1996) (internal quotations and citations omitted) (alteration in original); see also Dailey, 915 F. Supp. at 1321.

In the alternative, the plaintiffs move for a new trial pursuant to Rule 59. <u>See</u> Fed. R. Civ. P. 59(a).[2] In determining whether a new trial is appropriate under Rule 59(a), a court makes the same type of inquiry as on a motion for judgment as a matter of law, but it imposes a less stringent standard. <u>See</u> <u>Katara v. D.E. Jones Commodities, Inc.</u>, 835 F.2d 966, 970 (2d Cir. 1987). A Rule 59(a) motion "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." <u>Patrolmen's Benevolent Assoc. v. City of New York</u>, 310 F.3d 43, 54 (2d Cir. 2002) (internal quotations omitted); <u>Katara</u>, 835 F.3d at 970; <u>Newmont Mines Ltd. v. Hanover Ins. Co.</u>, 784 F.2d 127, 132 (2d Cir. 1986); <u>Fowler</u>, 2001 WL 83228 at *2.


## II.

There was sufficient evidence introduced at trial from which the jury could have found as follows. In November 1997, the plaintiff Ms. Velez was living in an apartment in the Bronx, New York, with her sons John Velez ("John") and Steven Pagan ("Steven"), who were 6 and 5 years old, respectively, at that

---

[2] Federal Rule of Civil Procedure 59(a) provides: "A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...."

time.  On November 19, 1997, an anonymous report was submitted to the New York State Central Registry alleging, among other things, that John was late to school many times, Ms. Velez was being physically assaulted by her "live-in boyfriend" (who the jury could conclude was Steven's father) in the presence of the children, that the mother is a drug/alcohol abuser, and that the children were not getting a minimum degree of care.  The defendant Evelyn Ortiz ("Ortiz"), an officer of the ACS, visited the Velez residence the following day.  While the initial report was determined to be unfounded, there were further reports and Ortiz returned to visit the family on numerous occasions over the following several months.  (Tr. 99-109, 116-17, 1260, 1264-65; Pls.' Ex. 1, 2.)  In the summer of 1998, Ortiz lost track of the family's whereabouts because they were no longer living in the same apartment.  (Tr. 374-78, 1275-76.)

On September 17, 1998, Ortiz received notification from the school that John and Steven attended that another incident of domestic violence between Steven's father and Ms. Velez had taken place, and went to the school with a supervisor.  (Tr. 120-22.)  After meeting with Cruz, the school principal, John Velez, and Ms. Velez, Ortiz decided, along with her supervisor, to take the children into ACS custody immediately.  (Tr. 122-27, 380-81.)  No prior court authorization for this course of action had been granted.  The following day, September 18, 1998, Ortiz

filed a neglect petition relating to each child in the Bronx Family Court and a brief hearing was held at which an appointed attorney agreed, on behalf of Ms. Velez, that the children be remanded to ACS custody pending an additional fact-finding hearing. (Tr. 189-90, 208-09, 386-88; Pls.' Exs. 11 & 48) ACS placed John and Steven in foster care with their respective paternal grandmothers. (Tr. 127-28, 388-90.)

On November 30, 1998, a fact-finding hearing on the matter was held in the Bronx Family Court. (Tr. 209-11.) Ortiz was the sole witness; Ms. Velez did not attend but was represented at the hearing by appointed counsel. (Tr. 209-10, 398-400.) Following that hearing, Judge Allen Alpert of the Bronx Family Court entered orders requiring Ms. Velez to complete domestic violence counseling, substance abuse counseling, and parenting skills classes, and remanding John and Steven to ACS custody for a period of up to one year, and ordering that they reside with their respective paternal grandmothers. (Pls.' Ex. 53; Defs.' Ex. Q.)

Those orders expired, or lapsed, on November 30, 1999. (Tr. 457-59.) On August 2, 2000, the defendant Kathia Brown ("Brown"), an ACS case manager who entered ACS employment in January 2000 and assumed responsibility for Ms. Velez's case in April 2000, filed a new neglect petition in the Bronx Family Court, alleging that Ms. Velez had failed to complete the

prescribed programs and requesting that the children remain in
ACS custody.  (Tr. 458-61; Pls.' Exs. 16 & 55.)  On August 2,
2000, the New York Family Court ordered that the children remain
in ACS custody until the next court date.  (Tr. 506.)

The August 2000 petition, like the earlier petition filed
by Ortiz, was later granted by order dated April 4, 2001.  (Tr.
509-12; Defs.' Ex. BBB.)  In these orders, Judge Alpert found
that Ms. Velez had failed to comply with the family service plan
prescribed in the November 30, 1998 order, and continued ACS
custody of the children until April 4, 2002.  (Defs.' Ex. BBB.)

On June 28, 2001, the Child Development Support Corporation
(the "CDSC"), a foster care agency assigned to administer the
children's foster care, reported to the Family Court that Ms.
Velez had completed all of the social service requirements set
forth in the November 30, 1998 Family Court order, and the only
barrier to her regaining custody of the children was that she
lacked adequate housing.  (Tr. 519-20; Defs.' Ex. GGG.)  In the
summer of 2001, Ms. Velez was living in the two-bedroom
apartment with her boyfriend and his mother, sharing a bedroom
with her boyfriend.  (Tr. 1328.)  ACS did not consider Ms.
Velez's housing suitable for the children.  (Tr. 582-83.)

On February 15, 2002, with the assistance of a Section 8
voucher, Ms. Velez moved into a two-bedroom apartment in the
Bronx.  (Tr. 594-98; Defs.' Ex. RRR.)  On February 28, 2002,

following a trial discharge conference, Brown signed a trial
discharge form returning the children to Ms. Velez's custody on
a provisional basis. (Tr. 444-47, Pls.' Ex. 14.) On June 25,
2002, following a final discharge conference, Brown signed a
final discharge form fully returning the children to Ms. Velez's
custody and ending ACS involvement in the case. (Tr. 450-53,
Pls.' Ex. 18.)


### III.

The plaintiffs contend that evidence they presented was
sufficient to establish, as a matter of law, that the defendants
violated their rights under the United States Constitution.

### A.

### 1.

The plaintiffs first argue that the initial removal of the
children John and Steven from the custody of the plaintiff
Lissette Velez by Ortiz, an ACS officer, on September 17, 1998,
violated their procedural due process rights under the
Fourteenth Amendment to the United States Constitution because
there was no "emergency circumstance" justifying that removal.[3]

---

[3] Ms. Velez also asserted a claim on behalf of the children that the
children's rights under the Fourth Amendment to be free from
unreasonable seizures were violated by the September 17, 1998 removal.
That claim is evaluated under the same standard applied to the
plaintiffs' procedural due process claim. Tenenbaum v. Williams, 193
F.3d 581, 605 (2d Cir. 1999).

Because the September 17, 1998 removal occured prior to the decision of the United States Court of Appeals for the Second Circuit in Tenenbaum v. Williams, 193 F.3d 581 (2d Cir. 1999), the Court must analyze the constitutionality of Ortiz's actions not under the standard announced in that case, but under the less exacting standard set by pre-existing caselaw, for the purposes of establishing Ortiz's liability. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because Ortiz could not reasonably have known of the Tenenbaum standard before the decision in that case was announced, she is entitled to qualified immunity if her actions, though in violation of Tenenbaum, were not in violation of clearly established law under the prior standard in this circuit.

Prior to Tenenbaum, the requirements of procedural due process in the context of a state removal of a child from the custody of that child's parent were governed by the decisions in Hurlman v. Rice, 927 F.2d 74 (2d Cir. 1991), and Robison v. Via, 821 F.2d 913 (2d Cir. 1987). It was already well-recognized by September 17, 1998, that parents and children have a constitutionally protected liberty interest in remaining

9

together as a family, but that that the state also has a strong interest in protecting children from abuse and neglect. See Stanley v. Illinois, 405 U.S. 645, 651-52 (1972); Tenenbaum, 193 F.3d at 593-94. Under Hurlman and Robison, a state officer removing a child from a parent's custody without consent or a prior court order violated due process unless the removal was justified by emergency circumstances. See Hurlman, 927 F.2d at 80; Robison, 821 F.2d at 921-22. "Emergency circumstances" were defined as "circumstances in which the child is immediately threatened with harm..., for example where there exists an 'immediate threat to the safety of the child' ...." Hurlman, 927 F.2d at 80 (quoting Sims v. State Dep't of Public Welfare, 438 F. Supp. 1179, 1192 (S.D. Tex. 1977) (three-judge court), rev'd on other grounds sub nom. Moore v. Sims, 442 U.S. 415 (1979)).

The City of New York, as a municipal defendant, cannot assert a defense of qualified immunity based on the good faith of its employees. Owen v. City of Independence, 445 U.S. 622, 638 (1983); see also Dunton v. County of Suffolk, 729 F.2d 903, 907 (2d Cir. 1984). The City of New York's liability is therefore determined under the standard announced in Tenenbaum. Tenenbaum clarified that, where sufficient time exists to seek prior judicial authorization prior to removing children from their parents' custody, due process requires that such judicial

authorization be sought and obtained.  Tenenbaum, 193 F.3d at

594-95.  Under Tenenbaum, therefore, circumstances are only

emergent if the threat to the child's health or safety is so

imminent that there is not "reasonably sufficient time" to seek

prior judicial approval.  Id. at 595.

Municipal liability must be predicated upon an underlying

constitutional violation by a municipal officer undertaken

pursuant to an official municipal policy, custom, or usage,

whether written or unwritten.  See Monell v. Dep't of Soc.

Servs. of the City of New York, 436 U.S. 658, 690-91 (1978).  In

this case, therefore, the jury was asked on the verdict form to

assess the constitutionality of the September 17, 1998 removal

of the children from Ms. Velez's custody under both the

Tenenbaum and the Robison/Hurlman standards, and found that no

violation had occurred under either standard.  There was

sufficient evidence presented in this case for the jury to

conclude that such an emergency existed, and accordingly there

is no reason to disturb the jury's verdict.

Evidence was presented that one child's teacher had, over

the past ten months, made repeated reports to ACS alleging

neglect by Ms. Velez.  Further evidence was presented that Ms.

Velez had declined to follow up on assistance that Ortiz had

recommended for her.  (Tr. 126-27, 170-71, 290-91, 383.)  The

jury could also have reasonably found that, the night before

Ortiz removed the children from Ms. Velez's custody, a severe case of violence had allegedly taken place in front of the children in which the father of one of the children had punched Ms. Velez, and Ms. Velez had violently thrown a cooking fork at the father. (Tr. 120-22, 1281-87.) Ortiz had also lost track of the family and did not know where they were staying, and did not know whether the children were in a place where they would be safe from the violence that had just occurred. (Tr. 181-83, 375-79, 1406.) Ortiz further testified that she received reports that the boys had been excessively absent from or late to school, and that Ms. Velez and Steven Pagan abused drugs, although she was never able to verify personally the reports of drug abuse. (Tr. 178-79, 363-65, 383.) This evidence was sufficient for the jury to conclude that there was an emergency threat to the children's health and safety, and that this threat was sufficiently imminent that there was no time for a court order to be obtained. The jury could well have concluded that the domestic violence had escalated and that the children were in danger, particularly because ACS had no knowledge where the children were living and what their living conditions were. Moreover, the jury could have concluded that it would not have been safe to allow the children to leave school for an uncertain destination and that it was in fact necessary to hold them until

a court could review the situation, which the Family Court did the very next day.

Because the standard for evaluating the sufficiency of the verdict with respect to the plaintiff children's unreasonable seizure claim is identical to the standard applied to the plaintiffs' procedural due process claim, the evidence supported the jury's conclusion that there was no violation of the plaintiffs' procedural due process rights or the children's Fourth Amendment rights.  See Tenenbaum, 193 F.3d at 605.

In the absence of an underlying constitutional violation under either standard, there is no also basis for municipal liability or for the supervisory liability of Commissioner Scoppetta or Commissioner Bell on the plaintiffs' procedural due process claim or unreasonable seizure claim with respect to the initial removal of the children.

**2.**

The jury further could have reasonably concluded that Ortiz did not violate the plaintiffs' right to equal protection of the laws by removing the children from Ms. Velez's custody on the basis of an irrelevant or irrational classification.  The plaintiffs alleged that the removal was motivated solely by Ms. Velez's status as a victim of domestic violence, which has been held to be a violation of equal protection.  See Nicholson v.

Scoppetta, 203 F. Supp. 2d 153, 248-49 (E.D.N.Y. 2002). As described above, however, there was sufficient evidence from which the jury could have concluded that Ortiz did not remove the children from Ms. Velez's care solely because Ms. Velez was a victim of domestic violence, but was rather motivated by other factors as well. (Tr. 382-83). In the absence of an underlying equal protection violation, there is no basis for supervisory or municipal liability on this claim either.

### B.

The plaintiffs also asserted claims against Ortiz and Brown arising out the neglect petitions filed in the Bronx Family Court on September 18, 1998 and August 2, 2000. The plaintiffs asserted that these defendants violated their procedural due process rights by knowingly making false statements in these petitions. The jury found in favor of the defendants on each of these two claims. Based on the evidence presented, the jury could have reasonably found that there was no deliberately false testimony by either Ortiz or Brown.

With respect to both pairs of neglect petitions, the plaintiffs cite, as intentional falsehoods, numerous allegations that were part of a "template" prepared by the New York City Law Department. The "template" plainly simply recites the requirements of the statute for defining a "neglected child,"

14

using "or" (i.e. the disjunctive), and then states "to wit,"
followed by the specific allegations that allegedly existed in
the particular case.  See N.Y. Family Court Act § 1012(f)
(definition of "neglected child"); see also N.Y. Family Court
Act § 1031 (procedure to determine abuse or neglect).  It is
clear upon a reading of the petitions that the affiants were
first reciting the list of statutory requirements, and later
stating that one of the requirements of the statute had been
satisfied "in that" the after-cited facts are known to the
affiants.  The jury could reasonably have found, based on a
reading of the petitions, that the words objected to by the
plaintiffs were not allegations made against Ms. Velez, but
rather were part of this introductory recitation of the
statutory requirements.  The jury could also have reasonably
concluded that no actual allegations made in the petitions were
false.

   With respect to the September 18, 1998 petitions, the
plaintiff alleges that the false testimony consisted of Ortiz
alleging in that that the mother was a "crackhead," but the
plain text of the petitions makes clear that that testimony was
always presented as an allegation that ACS had received.  (Pls.'
Exs. 11 & 48.)  Ortiz testified that she followed the template
in signing the petition.  (Tr. 197.)  The jury could reasonably
have found that Ortiz truthfully reported the statement as being

an allegation without taking a position on its truth. Indeed, in her testimony before the Family Court on November 30, 1998, Ortiz stated that "it was reported that the mother was a crackhead...." (Pls.' Ex. 53 at 6-7.) Ortiz herself never, in her neglect petitions or in Family Court, affirmatively stated that Ms. Velez was a crackhead. Ortiz did state, of her personal knowledge, that John informed the ACS worker about the violence he had witnessed, including that the father hit the mother, leaving marks and bruises on her face, and that Ms. Velez stabbed the father in his leg with a fork. (Pls.' Exs. 11, 48.) The jury could reasonably have found that Ortiz believed these statements to be true and that the statements were truthful. (Tr. 120-22, 380-81, 1281-87.)

With respect to the August 2, 2000 petitions, Brown's testimony was based on Brown's review of the record that led to the original placement. There was evidence presented that Brown petitioned to retain the children in ACS custody because she had information indicating that many of the circumstances leading to the original removal had not changed, and that Ms. Velez had failed to complete any of the services required in the November 30, 1998 order. (Tr. 482-87.) The jury was entitled to conclude that Brown believed her statements to be true at the time they were made.

For the reasons explained above, sufficient evidence also existed for the jury to conclude that Ortiz and Brown did not file the petitions solely because Ms. Velez was a victim of domestic violence, and therefore did not violate the plaintiffs' equal protection rights by filing those petitions in the Family Court.

In the absence of an underlying constitutional violation by either Ortiz or Brown, there is no basis for supervisory or municipal liability.

## C.

## 1.

The plaintiffs further urge that Brown violated their constitutional rights in connection with the lapse of the placement order on November 30, 1999. There was, however, sufficient evidence from which the jury could have found that Brown was not responsible for any constitutional violation relating to the lapsed placement, and the plaintiffs make no effort to show how the specific requirements of the constitutional claims as to which the jury was instructed were met in this case.

First, while Brown did admit in her testimony that the November 30, 1998 placement order had lapsed, it does not necessarily follow that Brown herself is responsible for any

violation of the plaintiffs' procedural due process rights.
There was evidence presented that, at the time of the lapse,
Brown was not yet employed by ACS, and did not assume
responsibility for Ms. Velez's case until several months after
the lapse.  (Tr. 458-59, 485.)  The jury could have found that,
when Brown became aware of the lapsed placement, she promptly
presented a petition to the Family Court in which she
acknowledged the lapsed placement, and that the Family Court
continued the placement pending a hearing, and indeed, following
a hearing on the matter, granted the petition to continue the
placement on April 4, 2001.  (Tr. 458-59, 485, 506; Defs.' Ex.
BBB.)

    The jury could reasonably have concluded that Brown did not
violate Ms. Velez's substantive due process rights or the Fourth
Amendment rights of the children in connection with the lapsed
placement.  The jurors were instructed that Brown had not acted
in violation of Ms. Velez's substantive due process rights if
she "had a reasonable basis for retaining custody of John Velez
and Steven Pagan after the twelve-month placement ordered by the
Bronx Family Court lapsed on November 30, 1999 and after she
became responsible for the case."  A similar standard applied to
the children's Fourth Amendment claim.

    The jury was presented sufficient evidence from which it
could conclude that continued ACS custody of the children was

reasonable. Evidence was presented that Ms. Velez had not complied with the terms of the November 30, 1998 order at the time Ms. Brown became aware of the lapsed placement. (Tr. 482-87.) When combined with the evidence concerning the problems in the household that led to the initial removal of the children from Ms. Velez's custody, and the fact that ACS custody was pursuant to order of the Family Court after Brown filed the second pair of petitions on August 2, 2000, this evidence was sufficient to permit the jury to conclude that ACS's retention of the children in 2000 was reasonable.

In addition, the jury was correctly instructed that a necessary element for a claim under 42 U.S.C. § 1983 is "that the acts of the defendant whom you are considering were a proximate cause of the injuries sustained by the plaintiffs." (Tr. 1734); see Townes v. City of New York, 176 F.3d 138, 146 (2d Cir. 1999); L.B. Sand, et al., Modern Federal Jury Instructions, ¶ 87.03 (Instr. 87-79 ("Proximate Cause—Generally")). The jury was further instructed that "[i]n order to recover damages for any injury, the plaintiff must show by a preponderance of the evidence that such injury would not have occurred without the [conduct of] the defendant in question. If you find that the defendant in question has proved, by a preponderance of the evidence, that the plaintiff complains about an injury which would have occurred even in the absence of

the defendant's conduct, you must find that the defendant did not proximately cause the plaintiff's injury." (Tr. 1735); see Sand, supra, at ¶ 87.03 (Instr. 87-79).

In this case, although the November 30, 1998 placement order lapsed on November 30, 1999, the jury may well have concluded that the lapse did not proximately cause any injury to the plaintiffs. It was not disputed that Ms. Velez had not complied with the placement order's conditions for the return of her children by the time of that order's expiration, and the Family Court found it appropriate to leave the children in ACS custody for a period lasting more than two years after the lapse. As a result, the jury could reasonably have concluded that the plaintiffs had failed to prove that a defendant's action or inaction deprived the plaintiffs of any constitutional rights.

As with the plaintiffs' other claims, there is no basis for municipal or supervisory liability because there is no showing of the underlying violation by any individual and therefore no evidence that such a violation was caused by a practice or policy of the City, or was caused by a failure of supervisory responsibility. The plaintiffs presented evidence that a large number of placement orders lapsed, but the mere numbers cited by the plaintiffs do not establish that constitutional violations occurred in each of those cases, or indeed in any one of those

cases.  The number of lapsed placements in other cases cited also do not establish there was a person who violated the plaintiffs' constitutional rights in this case, or that any such violation was caused by a municipal policy or practice or by a lack of supervisory responsibility by the most senior people in the Department.

Without any evidence of the individual circumstances of lapsed placements, it cannot be said that there was any practice or policy, or any lack of supervision, that brought about unconstitutional lapsed placements.  Specifically, it should be noted that Commissioners Bell and Scoppetta each testified that they were several levels removed from ACS employees who would have been directly responsible for the removals and lapsed placements.  (Tr. 1158, 1162, 1220-21.)

The defendants presented evidence that, in a large percentage of the lapsed placements cited by the plaintiffs, the parents had lost their rights because the children were adopted.  (Tr. 1232-33.)  In this case, Ms. Velez eventually consented to the continuation of the placement in foster care.  There is therefore no basis to conclude that Commissioners Bell and Scoppetta, or the City of New York, are liable to the plaintiffs in connection with the lapsed placement in this case.

**CONCLUSION**

For the reasons stated above, the Court cannot conclude that "the jury's findings could only have been the result of sheer surmise or conjecture, or [that] there is such an overwhelming amount of evidence in favor of [the plaintiffs] that reasonable and fair minded men could not arrive at a verdict against" them. Katara, 835 F.2d at 970. The Court also cannot conclude that "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." Id. The plaintiffs' motions pursuant to Fed. R. Civ. P. 50 and Fed. R. Civ. P. 59 are therefore **denied**. The defendants' motion pursuant to Fed. R. Civ. P. 50 is **denied as moot**.

The Clerk is directed to enter Judgment dismissing the complaint and closing this case.

**SO ORDERED.**

**Dated: New York, New York
June 22, 2006**

**John G. Koeltl
United States District Judge**

22